1
2
3
4
5
6                        IN THE UNITED STATES DISTRICT COURT
7
                        FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9
ELIZABETH FREI,                              No. C-05-01191 EDL
10
            Plaintiff,                       **ORDER DENYING DEFENDANT'S**
11                                           **MOTION FOR SUMMARY JUDGMENT**
    v.                                       **AND REMANDING MATTER TO PLAN**
12                                           **ADMINISTRATOR**
HARTFORD LIFE INSURANCE COMPANY,
13
            Defendant.
14  _____/

15          Plaintiff Elizabeth Frei, an employee of Credit Suisse First Boston Corporation, was insured
16
under her employer's Group Long Term Disability Benefits Plan ("the Plan") as of July 1, 1998.  In
17
August 1999, Plaintiff was seriously injured in a car accident and in October 2000, she had spinal
18
surgery necessitated by her injuries.  Unable to return to work, Plaintiff filed a claim for disability
19
benefits pursuant the Plan, and Defendant Hartford Life Insurance Company, as the administrator of
20
the Plan, paid her benefits for several years.  After those benefits were finally terminated in February
21
2004 and on appeal in September 2004, Plaintiff filed a state court action against Defendant,
22
alleging that she was entitled to disability benefits as provided in the Plan.  Defendant removed the
23
state court action to federal court pursuant to the Employee Retirement Income Security Act of 1974
24
("ERISA"), 29 U.S.C. § 1001, et seq., because Plaintiff sought benefits under an ERISA-covered
25
plan.
26
            Defendant now seeks summary judgment.  Plaintiff opposed the motion and filed a cross-
27
motion for summary judgment.  On February 3, 2006, the Court granted Defendant's motion to
28
strike Plaintiff's untimely and improperly noticed cross-motion.

            The Court held a hearing on February 14, 2006.  As requested by the Court at the hearing,

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Defendant filed a supplemental brief on February 14, 2006, citing information in the record

2    regarding Plaintiff's occupation that was provided to the independent reviewing neurosurgeon, Dr.

3    Schlachter, to assist him in preparing his review.  The Court permitted Plaintiff leave to file a

4    responsive brief to bring any other citations from the record regarding the information provided to

5    Dr. Schlachter to the Court's attention.  Plaintiff filed a responsive brief on February 16, 2006 that

6    went far beyond the scope of the requested briefing.  For that reason, Defendant filed an objection

7    and request to strike Plaintiff's responsive brief.  To the extent that Plaintiff's responsive brief goes

8    beyond the scope of the Court's request for briefing and Defendant's supplemental brief,

9    Defendant's objection is sustained and the brief is stricken.

10       For the reasons stated at the hearing and in this Order, the Court denies Defendant's motion

11   for summary judgment and remands the case to the Plan Administrator for a reevaluation of

12   Plaintiff's claim in accordance with this Order.

13   **FACTS**

14       On June 5, 1995, Plaintiff began working at Credit Suisse First Boston as a sales assistant,

15   and on July 1, 1998, she became insured under Credit Suisse's Long Term Disability Benefits Plan.

16   Her job, which was classified as sedentary, involved staffing a busy trading desk and required that

17   she sit constantly for seven hours per day or longer, with only approximately one hour standing with

18   rest.  AR at 628; 650-51.

19       On August 28, 1999, Plaintiff was seriously injured in a car accident.  She attempted to

20   return to work, but was unable to because of the pain she suffered from having to sit for the long

21   periods as required by her job.  AR at 628.  The last day she was able to work was July 31, 2000.

22   AR at 629.  On October 9, 2000, Plaintiff underwent spine surgery.  On October 31, 2000,

23   approximately three weeks after surgery, Dr. Jones, Plaintiff's orthopedic surgeon, indicated that

24   Plaintiff was healing well, but was in some increased pain because a woman fell on her from a flight

25   of stairs.  AR at 582-83.  He stated that Plaintiff had been able to walk as much as two hours but had

26   increased pain and/or fatigue with that amount of exercise.  Id.  On December 5, 2000, Dr. Jones

27   stated that her surgical wound was healing well and that Plaintiff was walking frequently, but that

28   she complained of a slight burning in her back and some residual neuritic symptoms in her legs that

2

**United States District Court**
For the Northern District of California

1   were responding well to medication.  AR at 578-79.  On February 6, 2001, Dr. Jones stated that

2   Plaintiff was able to walk much further and longer distances, that her wound was healing well, and

3   that she was able to increase her sitting tolerance to forty-five to sixty minutes until she took a

4   prolonged drive to Santa Barbara.  AR at 576.  Since then, however, her sitting tolerance decreased

5   to fifteen to thirty minutes.  Id.  Plaintiff reported that her back felt stronger and that she had less

6   neuritic symptoms in her legs.  Id.

7        Meanwhile, on January 10, 2001, Plaintiff submitted a claim for disability benefits.  AR 627-

8   637.  In the application, Plaintiff complained of back and leg pain made worse with walking, with

9   sitting for more than thirty minutes, with bending and with lifting.  AR at 636.

10       On March 8, 2001, Defendant denied Plaintiff's application for benefits based on Dr. Jones'

11  reports that Plaintiff was healing well, the sedentary demands of Plaintiff's job, and Defendant's

12  guidelines that the recovery time for her surgery was only sixteen weeks.  AR at 569-72.  Plaintiff

13  appealed the denial and her benefits, and submitted an MRI and a March 27, 2001 report from Dr.

14  Jones stating that Plaintiff was not capable of performing her job at that time and that the recovery

15  time was at least nine to twelve months for her surgery.  AR at 539-40.  On appeal, Defendant

16  referred the file for a medical records review.  Dr. F.B. Dibble reviewed Plaintiff's file and issued a

17  report on May 7, 2001, stating that "in the present case with the magnitude of the intervention

18  [surgery], a protracted recovery period is not unexpected," and that "it is my opinion that full

19  recovery for previous activity in this case should not be expected within six months and may take up

20  to nine months or more."  AR at 535-36.  Defendant reversed its denial of benefits on May 31, 2001.

21  AR at 543-46.

22       On February 12, 2002, March 3, 2002 and April 3, 2002, Defendant sent letters to Plaintiff

23  requesting updated information and completion of forms.  AR at 510-13.  On April 11, 2002,

24  Plaintiff wrote to Defendant, saying that she just received the April 3, 2002 letter on April 11, 2002

25  and that she never received the February 12, 2002 letter.  AR at 471-72.  It appears that she did

26  receive the March letter, although she may have been out of town when it arrived.  Id.  In her letter,

27  she stated that she was sending some forms and that she would forward the physician form to her

28  chiropractor.  Id.  Also on April 11, 2002, Plaintiff completed a questionnaire from Defendant

stating that her symptoms were getting worse. AR at 497-505. On June 4, 2002, Dr. Jones signed a

form stating that Plaintiff could undergo a functional capacities evaluation. AR at 474.

On July 2, 2002, Defendant terminated Plaintiff's disability benefits due to Plaintiff's failure

to respond to the February, March and April letters and the absence of current statements from

physicians. AR at 463-65. On July 23, 2002, Plaintiff submitted additional information through

counsel, including Dr. Jones' July 9, 2002 report and a recent report from the Pain Management

Center stating that Plaintiff's "generalized body pain has increased, especially upon prolonged

upright position," and that Plaintiff "developed central buttocks and left groin numbness," and "a

burning sensation in the feet." AR at 454-59. The Pain Management Center report concluded that it

was difficult to tell whether the pain was secondary to the syrinx in her spine or some other

etiology.[1] AR at 459. Another July 9, 2002 report from Dr. Jones lists Plaintiff's complaints and

states that she would be seen again at the two year post-operative mark, and that he gave her a

prescription for Pilates therapy. AR at 444. Defendant also received the July 8, 2002 report by Dr.

Azzolino, Plaintiff's chiropractor, stating that Plaintiff's lower back and leg pain had retrogressed

and that her mid-back pain remained unchanged, but that her shoulder and neck pain had improved.

AR at 427-30. Dr. Azzolino also stated that Plaintiff could only work a maximum of three hours per

day and that she could never return to work at her regular occupation. AR at 429-30. On October 9,

2002, Plaintiff submitted a list of her doctors. AR at 371-75. Having received this additional

information, Defendant reinstated Plaintiff's benefits on November 6, 2002. AR at 365-67.

The record contains medical evidence post-dating the November 2002 reinstatement of

benefits. On February 7, 2003, Dr. Collins, Plaintiff's primary care physician, noted in Plaintiff's

chart that she was "stable." AR at 91. A March 11, 2003 report from the Pain Management Center

states that Plaintiff's complaints of generalized body pain seem to be neuropathic in nature. AR at

214. In an April 2003 report, Dr. Barbaro, Plaintiff's neurosurgeon, noted that Plaintiff had a variety

of pain complaints, but that there was no obvious change in the size of the syrinx and that "her

neurological examination remains the same," and that "she had normal coordination and strength,"

---

[1]    It is undisputed that Plaintiff has a syrinx, which is a fluid-filled cavity on her spinal cord. The medical evidence shows that it is small and that surgery is not a good option because it is not large enough. See Def.'s Mot. at n. 3; AR at 17.

United States District Court
For the Northern District of California

1   so she should return for another evaluation in six months.  AR at 175; see also AR at 103-04.  Dr.

2   Jones stated in an October 7, 2003 report that Plaintiff had "no significant restrictions of range of

3   motion except for extension," and that she had "no obvious neurological deficit."  AR at 100.  In an

4   October 9, 2003 treatment note, Dr. Collins stated that Plaintiff was stable on Percocet, and "all OK

5   otherwise."  AR at 90.

6        Also during this time, Defendant conducted surveillance of Plaintiff on three occasions, each

7   occasion being over a two-day period, on June 14 and 15, 2002, November 19 and 20, 2002 and

8   January 4 and 5, 2003.  The video shows Plaintiff walking briskly, getting in and out of her car while

9   running errands, carrying numerous packages, standing on the street talking to her neighbor, opening

10  the car door, pumping gas and carrying her backpack.  None of them shows her engaging in such

11  extensive activities on two consecutive days.

12       On June 25, 2003, Defendant's investigator interviewed Plaintiff, with her counsel present,

13  and produced a summary of the interview.  Compare AR 224-30 (the copy of the investigator's

14  summary given to Plaintiff at the conclusion of the interview) with AR at 201-08 (copy of the

15  statement after changes made by Plaintiff).  In the summary, Plaintiff states that her disabling

16  conditions are the syrinx in her spine, the disk herniation and the spinal fusion.  AR at 202.  She says

17  that the physicians currently certifying her disability are Dr. Collins and Dr. Azzolino, but that Dr.

18  Jones had previously certified her.  Id.  She stated that her condition had deteriorated over the past

19  year and that her pain is more severe now and a lot more things set off her pain.  AR at 203.  She

20  explains her limitations with respect to daily life, such as walking (limited to one hour at a time

21  before severe pain sets in, but able to walk briskly on flat ground), sitting (limited to one hour at a

22  time until the pain becomes unbearable and results in severe pain from feet to chest area) and

23  standing (limited to thirty minutes at a time before severe pain starts).  AR at 203-08.

24       On December 30, 2003, Defendant referred Plaintiff's file to the University Disability

25  Consortium for an independent medical records review.  AR at 78-79.  On January 16, 2004, Dr.

26  Schlachter provided a report based on Plaintiff's medical records, the surveillance video, and a

27  conversation with Dr. Collins.  AR at 72-74.  Among other items in that report, Dr. Schlachter stated

28  that Dr. Collins said that Plaintiff could work in sedentary employment if she had the ability to

**United States District Court**
For the Northern District of California

1    stand, sit, stretch and rest.  AR at 73.  Dr. Schlachter concluded that Plaintiff was capable of

2    employment in a sedentary position such as a sales assistant.  AR at 74.

3          On February 12, 2004, Defendant terminated Plaintiff's benefits.  AR at 67-71.  Defendant

4    stated that it reviewed the file as a whole, and that based on a comparison between the demands of

5    her job as stated by her employer and the opinions of Drs. Collins, Jones, Schlachter and the video

6    surveillance, she was no longer disabled.

7          On August 10, 2004, Plaintiff appealed Defendant's termination and submitted a medical

8    report from Dr. Ellenbogen, Plaintiff's neurosurgeon in Washington state.  AR at 14-22.  Dr.

9    Ellenbogen reports that the syrinx has most likely caused Plaintiff's neurological problems with pain

10   and sensory loss, and that the syrinx is too small for surgery.  AR at 17.  Dr. Ellenbogen did not

11   specifically opine on Plaintiff's ability to work.  Also included in the record is a letter from Dr.

12   Collins dated August 28, 2004 in which she states that Plaintiff could not possibly work an eight

13   hour day sitting and standing, and that she would have to be heavily sedated to deal with the pain

14   that a return to work would cause.  AR at 5; Frei Decl. Ex. B.  Dr. Collins also states that Defendant

15   should contact Plaintiff's neurosurgeon and her chiropractor.

16         On September 17, 2004, Defendant notified Plaintiff of the decision to uphold the

17   termination of her benefits.  AR at 6-9.  The notice stated that its decision was based on Dr. Collins'

18   and Dr. Schlachter's statements that Plaintiff could perform the sedentary position of sales assistant,

19   and on the fact the Dr. Ellenbogen's report added nothing new because he did not opine on

20   Plaintiff's functionality.

21   **STANDARD OF REVIEW**

22         A denial of benefits under ERISA is reviewed "under a *de novo* standard unless the benefit

23   plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits

24   or to construe the terms of the plan," in which case the administrator's decision is reviewed for

25   abuse of discretion.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Here, the

26   policy language clearly confers discretion on Defendant to decide whether a claimant is disabled:

27         We have full discretion and authority to determine eligibility for benefits and to
           construe and interpret all terms and provisions of the Group Insurance Policy.

28

6

**United States District Court**
For the Northern District of California

1  Davis Decl. Ex. A (Disability Policy) at 22; see also, e.g., Jordan v. Northrop Grumman Corp.

2  Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004) (policy conferred discretion stating: "the

3  Travelers has the discretion to construe and interpret the terms of the Plan and the authority and

4  responsibility to make factual determinations. . . .").

5       A less deferential standard of review may apply, however, where there is a serious conflict of

6  interest.  To establish a serious conflict that would justify *de novo* review despite a conferral of

7  discretion,

8          the beneficiary has the burden to come forward with *"material, probative*
           *evidence, beyond the mere fact of the apparent conflict, tending to show that the*
9          *fiduciary's self-interest caused a breach of the administrator's fiduciary*
           *obligations to the beneficiary."* Atwood, 45 F. 3d at 1323.  If the beneficiary
10         cannot satisfy this burden, the district court should apply the traditional abuse of
           discretion review.  If the beneficiary does satisfy the burden, the plan then bears
11         the burden to show the conflict of interest did not affect the decision to deny
           benefits.

12

13  Bendixen v. Standard Ins. Co., 185 F.3d 939, 943 (9th Cir. 1999) (emphasis added); see also

14  Firestone Tire, 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or

15  fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in

16  determining whether there is an abuse of discretion.").  If the beneficiary comes forward with

17  material and probative evidence of a serious conflict, the plan administrator bears the burden of

18  producing evidence that the conflict of interest did not affect the decision to deny benefits, but if the

19  plan fails to meet its burden, the court reviews the decision to deny benefits *de novo*.

20       Where, as here, the insurance policy is both issued and administered by Defendant, there is

21  an apparent conflict of interest.  Bendixen, 185 F.3d at 943 ("We have previously held with respect

22  to a similar plan that 'given Standard's dual role as both the funding source and the administrator of

23  the Plan, we are faced with an inherent conflict of interest situation, and must take this factor into

24  account.'") (quoting Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125

25  F.3d 794, 797 (9th Cir. 1997)).  This apparent conflict, however, is not enough by itself to establish a

26  serious conflict warranting *de novo* review.  Jordan, 370 F.3d at 876 ("Though the claimant

27  obviously had a financial interest in getting the money, while the plan has a financial interest in

28  keeping it, that alone cannot establish conflict of interest in the administrator, because it would leave

1    no cases in the class receiving deferential review under Firestone").

2          Plaintiff argues that Defendant has a serious conflict of interest because:  (1) Defendant

3    failed to conduct a functional capacity evaluation before denying benefits; (2) Defendant failed to

4    request an updated Proof of Loss from Plaintiff's treating physicians after July 2002; (3) Defendant

5    failed to instruct Dr. Schlachter to contact the appropriate doctors; (4) Defendant failed to provide

6    Dr. Schlachter with a copy of the Physical Demands Analysis of Plaintiff's job to determine whether

7    she could return to her own occupation as opposed to any sedentary job; (5) Defendant failed to

8    conduct an employability analysis to determine if Plaintiff was disabled under her own occupation or

9    whether reasonable accommodations existed; (6) Defendant determined that Plaintiff was not

10   disabled from her own occupation without any opinion from a physician that she is not disabled

11   from her own occupation and based only on Dr. Schlachter's opinion about Plaintiff's ability to

12   work in a sedentary setting; (7) Defendant failed to consider Plaintiff's treating doctors' opinions

13   regarding Plaintiff's inability to return to her own occupation and failed to contact Plaintiff's

14   neurosurgeons; and (8) Defendant failed to have Plaintiff's claim reviewed by a qualified orthopedic

15   surgeon concerning Plaintiff's ability to return to her own occupation.  None of these reasons

16   establishes a serious conflict to justify departure from the abuse of discretion standard in favor of *de*

17   *novo* review.  Cf. Friedrich v. Intel Corp., 181 F.3d 1105, 1110 (9th Cir. 1999) (finding material

18   probative evidence beyond the mere fact of the apparent conflict that was not rebutted by the

19   administrator where the administrator failed to follow its internal procedure of providing a claim

20   packet to give claimant notice of the application process, rendering claimant unable to submit any

21   evidence, failed to provide sufficient notice of the denial of the claim, failed to objectively analyze

22   the claim, and failed to fairly analyze the appeal of the denial).

23         First, Plaintiff has provided no authority requiring Defendant to conduct a functional

24   capacity evaluation ("FCE"), even though there is evidence that Defendant considered conducting

25   that evaluation.  See AR at 474 (Defendant sought and received Dr. Jones' permission to conduct an

26   FCE), see also AR at 540 (Dr. Jones suggested that an FCE may be necessary); AR at SIU240 (email

27   from Defendant's Investigative Analyst regarding whether an FCE was going to be conducted for

28   Plaintiff).  Further, the policy does not require an FCE, but only states that Defendant *may* have a

1  claimant examined to determine if she is disabled.  Davis Decl. Ex. A at 23 (emphasis added).

2  Defendant's failure to obtain an FCE does not show a serious conflict of interest because the

3  evaluation was not mandatory and the record contains ample evidence of Plaintiff's medical

4  condition.

5        Second, although Plaintiff argues that Defendant failed to obtain updated Proof of Loss

6  statements from Plaintiff's physicians after July 2002, Plaintiff has failed to provide any authority

7  that requires Defendant to obtain that form.  The policy says that a Proof of Loss form is required

8  within thirty days of the start of the disability period, and that Defendant "*may* require, at reasonable

9  intervals, additional written Proofs of Loss throughout your Disability." <u>See</u> Davis Decl. Ex. A at 23

10  (emphasis added).  The failure to obtain updated Proofs of Loss is not a serious conflict of interest

11  because there is no mandatory requirement to do so after the initial disability period.  Further,

12  Plaintiff points to no authority under ERISA imposing on Defendant a duty to investigate or to

13  gather all of Plaintiff's medical records.  <u>See</u> <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1091 (9th

14  Cir. 1999) (stating that if a claimant believed that certain medical information should have been

15  considered by the plan administrator, "he should have sent it to them.").

16        Third, Plaintiff argues that Dr. Schlachter was not instructed to contact Dr. Jones who last

17  certified Plaintiff's disability, or Dr. Ellenbogen, her treating neurosurgeon who was following her

18  syrinx, and was instead instructed to contact Dr. Collins, Plaintiff's family doctor.  Defendant does

19  not dispute that it instructed Dr. Schlachter to contact Dr. Collins, but argues that it was reasonable,

20  and therefore not a conflict of interest, to do so.  In the June 25, 2003 interview with Plaintiff by

21  Defendant, she stated that Dr. Collins and Dr. Azzolino were presently certifying her disability, so it

22  was not unreasonable for Defendant to instruct Dr. Schlachter to contact Dr. Collins.  Further, Dr.

23  Schlachter also had Plaintiff's medical records from Dr. Jones and Dr. Barbaro.  AR at 72.

24  Defendant's failure to instruct Dr. Schlachter to contact Dr. Jones or Dr. Ellenbogen was not a

25  serious conflict of interest.

26        Fourth, Plaintiff argues that Defendant erred in denying benefits based on Plaintiff's ability

27  to work in a sedentary position in general, rather than her ability to work in her own specific position

28  as a sales assistant.  Plaintiff provides no authority for her argument that Defendant was required to

determine that Plaintiff was disabled from her specific job at Credit Suisse, rather than that she was disabled from her occupation as a sales assistant at a trading desk, regardless of employer. The policy does not require that Defendant make a determination of disability based on the exact position at Credit Suisse. Rather, the policy states:

> Your (Own) Occupation: If used in this Booklet-certificate, means your occupation as it is recognized in the general workplace. Your (own) occupation does not mean the specific job you are performing for a specific employer or at a specific location.

Davis Decl. Ex. A at PLAN018. Under the policy, a person is totally disabled if she is prevented from "performing the essential duties of your occupation." Davis Decl. Ex. A at 9. Dr. Schlachter determined that Plaintiff could work, possibly with accommodations, in a sedentary position, which includes one in which a person would sit for seven hours per day and stand for one hour per day with rest, such as Plaintiff's sales assistant occupation. Although the Court concludes below that Defendant's conclusion regarding Plaintiff's disability from her occupation is unsupported by the record, this issue does not rise to the level of a serious conflict of interest for purposes of heightening the standard of review.[2]

Because Plaintiff has failed to demonstrate a serious conflict of interest that caused a breach of the administrator's fiduciary duty to Plaintiff, the Court reviews the denial of disability benefits for an abuse of discretion.

**ANALYSIS**

The question of whether the administrator abused its discretion in denying disability benefits is a question of law. "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of

---

[2]   This case is distinguishable from Lundquist v. Continental Casualty Co., 394 F. Supp. 2d 1230 (C.D. Cal. 2005) on which Plaintiff relies to argue for reversal of Defendant's denial of benefits, rather than remand. There, the court, reviewing the case *de novo*, determined that the plan administrator had a serious conflict of interest because the administrator misclassified and/or minimized the plaintiff's job responsibilities throughout the handling of the case and appeal, in particular because the administrator ignored evidence repeatedly given by the plaintiff regarding her own description of her job functions, which differed significantly from the administrator's description. Lundquist, 394 F. Supp. 2d at 1250-51 (reversing denial of benefits). By contrast, here, the record does not show that Plaintiff gave Defendant any detailed information about the nature of her job.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    material fact exists, do not apply." Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir.

2    1999). When reviewing an administrator's decision for abuse of discretion, the Court must consider

3    only the evidence that was before the administrator when the decision was made.[3] Alford, 311 F.3d

4    at 959.

5         An ERISA administrator abuses its discretion only if it: (1) renders a decision without

6    explanation; (2) construes provisions of the plan in a way that conflicts with the plain language of

7    the plan; or (3) relies on clearly erroneous findings of fact. Bendixen, 185 F.3d at 944; see also 29

8    C.F.R. § 2560.503-1(h)(2) (plan administrator must provide for full and fair review of an appeal of a

9    denied claim, including a review that takes "into account all comments, documents, records and

10   other information submitted by the claimant relating to the claim."). A finding is "clearly

11   erroneous" when "although there is evidence to support it, the reviewing [body] on the entire

12   evidence is left with the definite and firm conviction that a mistake has been committed." Concrete

13   Pipe & Prods of Cal., Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S.

14   602, 622 (1993); see also Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan, 410 F.3d

15   1173 (9th Cir. 2005). A decision that is not supported by substantial evidence in the record also

16   constitutes an abuse of discretion. McKenzie v. Gen. Tel. Co., 41 F.3d 1310, 1316 (9th Cir. 1994).

17        Here, Defendant erred by applying a definition of total disability that conflicts with the

18   plan's language when it denied benefits based on Plaintiff's ability to work with accommodations.

19   The policy definition of total disability states in full:

20   _____

21        [3]    Defendant filed objections to exhibits submitted by Plaintiff in her declaration in
     opposition to this motion. Exhibit A is the July 9, 2002 Attending Physician's Statement of Disability
22   and Physical Capacities Evaluation Form, both completed by Dr. Jones. The first and third pages of
     Exhibit A are already in the record (AR at 457-458), so as to those pages, Defendant's objection is
23   sustained. Defendant notified Plaintiff in a July 31, 2002 letter that pages two and four needed to be
     completed and returned. AR at 454. It does not appear that Plaintiff ever provided pages two and four
24   of Exhibit A to Defendant. Therefore, Defendant's objection to those pages is sustained. Exhibit B is
     a letter from Dr. Collins, Plaintiff's family doctor, to Defendant dated August 28, 2004. The letter is
25   in the administrative record at page five, but the first paragraph is almost completely obscured by a Post-
     it note. Exhibit B is simply a clean copy of the letter; Defendant's objection to the exhibit on the
26   grounds that the letter is already in the record is overruled. Exhibit C is a letter from Plaintiff to
     Defendant dated August 25, 2001. The exhibit contains what appears to be a proof of mailing, but it is
27   completely illegible. There has been no showing that this letter was ever a part of the record before the
     administrator, so Defendant's objection to Exhibit C is sustained. Exhibit D is Plaintiff's Application
28   for Long Term Disability Benefits dated December 12, 2000. This document is already part of the
     administrative record (AR at 636-637). Defendant's objection to Exhibit D is sustained.

United States District Court

For the Northern District of California

> Total Disability or Totally Disabled means you are prevented by: (1) accidental bodily injury; (2) sickness; (3) mental illness; (4) substance abuse; or (5) pregnancy, from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

Davis Decl. Ex. A at PLAN018.  An essential duty is one that: "(1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) can not be reasonably omitted or changed."  Id. at PLAN 014.  "Your occupation" is defined as:

> . . . your occupation as it is recognized in the general workplace.  Your (own) occupation does not mean the specific job you are performing for a specific employer or at a specific location.

Davis Decl. Ex. A at PLAN018.  The policy's definition of total disability is not the same as the inability to perform the essential duties of a class of occupations as modified to accommodate injury, which is the standard that Defendant applied to Plaintiff's claim, particularly when there is no evidence that Plaintiff's own occupation can be so modified.  See, e.g., Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 460-61 (9th Cir. 1996) (finding that plan administrator abused its discretion "by erroneously factoring 'accommodation' into the criteria for total disability for purposes of occupational disability benefits.").[4]

Defendant's final denial of benefits after Plaintiff's appeal was based primarily on Dr. Schlachter's opinion that Plaintiff was "capable of employment in a sedentary position such as a sales assistant."  Dr. Schlachter relied in part on his conversation with Dr. Collins on January 15, 2004 in which, according to Dr. Schlachter, Dr. Collins told him that Plaintiff's current medical condition was compatible with "sedentary type employment where allowances would be made for the ability to stand, sit, stretch and rest."  AR at 73-74.  Based on Dr. Schlachter's opinion, including his report of Dr. Collins' opinion, Defendant concluded that Plaintiff no longer satisfied the policy definition of disability because none of her restrictions or limitations would prevent her from performing the essential duties of her own occupation as a sales assistant, which is a "sedentary

---

[4]  Defendant attempts to distinguish Saffle on the ground that it defined disability from one's own occupation as inability to perform each and every job duty, not just the essential duties. But this difference does not amount to a relevant distinction.  Saffle's holding that the administrator cannot modify the policy definition of occupation to add a provision for reasonable accommodation applies equally here.

United States District Court

For the Northern District of California

1    physical-demand occupation."  AR at 7.

2         In reaching this conclusion, Defendant abused its discretion by determining that only

3    disability from *any* sedentary position would trigger coverage under the policy.  In effect, Defendant

4    erroneously applied a virtual "any occupation" standard to its "own occupation" policy.  See Mizzell

5    v. The Paul Revere Life Ins. Co., 118 F. Supp. 2d 1016, 1020-22 (C.D. Cal. 2000) (interpreting an

6    "own occupation" policy and holding that "[i]n utilizing the Department of Labor's definition of

7    plaintiff's occupation of Vice President/General Manager to determine that plaintiff's position was

8    sedentary, rather than examining plaintiff's actual job duties, Paul Revere acted contrary to the plain

9    language of the plan and abused its discretion."); see also Dionida v. Reliance Standard Life Ins.

10   Co., 50 F. Supp. 2d 934, 941 (N.D. Cal. 1999) (stating that the plaintiff's occupation was not simply

11   a registered nurse, but a general duty nurse; "Thus, instead of defining Dionida's 'regular

12   occupation' based on the contours of her previous job, Reliance tailored its definition of Dionida's

13   'regular occupation' to fit her physical capabilities *after* becoming disabled.  By doing so, Reliance

14   in effect applied the 'any occupation' standard rather than the 'regular occupation' standard required

15   by the LTD plan.") (emphasis in original).

16        Defendant relies on Hornback v. New York Times Co. LTD Plan, 2006 WL 496050 (N.D.

17   Cal. March 1, 2006), which held that a plan administrator did not err merely because it considered,

18   along with other evidence of the nature of the plaintiff's occupation, the Department of Labor's

19   Dictionary of Occupational Titles.  See Def.'s Supp. Brief re: Remand at 2:12-15.  However, the

20   administrator in Hornback used the title "Manager-Newspaper Circulation" -- a definition of

21   occupation considerably narrower than "sedentary position such as a sales assistant" which

22   Defendant used here.  Furthermore, in Hornback, the administrator also gave the plaintiff's own

23   specific job description to the doctor on whose opinion it relied, and he incorporated her job

24   description into his evaluation.  Thus, this case is more like Mizzell than Hornback.

25        Defendant correctly points out that Plaintiff's interpretation of her occupation as her

26   particular job with her then-employer conflicts with the policy language ("Your (own) occupation

27   does not mean the specific job you are performing for a specific employer or at a specific location.").

28   But although the policy's definition of  "own occupation" is broader than Plaintiff would have it, the

definition is also much narrower than the one that Defendant applied.  See Kinstler v. First Reliance Standard Life Ins. Co., 1997 WL 401813, *7-8 (S.D. N.Y. 1997) (finding a "sensible middle course between the extreme definitions of 'regular occupation' as, on the one hand, one's particular job with a particular employer, and, on the other hand, 'the principal business of one's life;'" stating that the term "regular occupation" should be construed to mean "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties," and that simple application of the Department of Labor definition of a job title was improper because utilizing the general definition "ignored the 'skills and training' and 'comparable duties' required by the plaintiff's [specific] job.") (citing Dawes v. First Unum Life Ins., 851 F. Supp. 118, 122 (S.D. N.Y. 1994)).  Defendant's conclusion improperly blurred the distinction between a broad policy covering disability from *any* occupation and a narrow one, as here, covering disability from a claimant's *own* occupation.

Moreover, Defendant's conclusion in the September 17, 2004 final denial of benefits that Plaintiff was not disabled because she was "capable of engaging in sedentary physical-demand level work on a full-time basis with restrictions" (AR at 9) makes an assumption about the availability of accommodations of her restrictions that is unsupported by the record.  There is no evidence as to whether Plaintiff's past employer, or any other employer, would permit sufficient modifications to Plaintiff's very demanding sales assistant job at a trading desk in a financial services firm, to accommodate her restrictions on prolonged sitting or standing and need for breaks.  The only evidence of the physical demands of Plaintiff's position is that it is a sedentary position that requires seven hours sitting and one hour standing with rest with occasional fingering, reaching and handling.  AR at 650-51.  Further, by the time Defendant denied the appeal from its termination of benefits based primarily on Dr. Schlachter's report, Dr. Collins had submitted a letter to Defendant dated August 28, 2004 (six months after Plaintiff's benefits were terminated in February 2004), in which she stated that Plaintiff "could not possibly do an 8 hour day sitting and standing" as required by her occupation, and that if Plaintiff were to return to work, "she would have to be heavily sedated to deal with the pain."  Frei Decl. Ex. B.  Even though Dr. Collins' letter pre-dates Defendant's final denial of benefits, Defendant did not mention this letter or its contents in the final denial, despite the fact

14

United States District Court
For the Northern District of California

1    that it is directly contrary to Dr. Schlachter's statement of Dr. Collins' opinion.

2         In addition, there is no evidence that Dr. Schlachter had Plaintiff's employer's physical

3    demands analysis or any other information about the actual demands of Plaintiff's occupation from

4    which he could determine whether the accommodations that he recommended were feasible.  Dr.

5    Schlachter reviewed the summary of Plaintiff's June 25, 2003 interview with Defendant's

6    investigator, and Plaintiff's medical records, including those from Dr. Jones, Dr. Collins and Dr.

7    Barbaro.  Def.'s Supp. Brief at 3-4.  But these documents only refer to the title of Plaintiff's

8    position, not to whether her employer (or any other employer of people in her occupation) could and

9    would accommodate restrictions in the trading desk sales assistant position.  The mere title "sales

10   assistant" conveys insufficient information, and fails to distinguish between, for example, a retail

11   sales clerk at a department store where work demands ebb and flow, versus a sales assistant at a

12   busy trading desk at a financial services firm.  The policy at issue provided coverage for disability

13   from one's own occupation -- a category broader than Plaintiff's particular job at her precise

14   employer, but narrower than all the myriad jobs that share the broad title "sales assistant."

15        Defendant argues that it could assume accommodations were available because Plaintiff had

16   a skilled sedentary occupation, quoting a social security ruling cited by Auckland v Massanari, 257

17   F.3d 1033, 1036 (9th Cir. 2001) that recognized that "there are some jobs in the national economy –

18   *typically* professional and managerial ones – in which a person can sit or stand with a degree of

19   choice."  Social Security Ruling 83-12 (emphasis added).  Auckland, however, did not consider the

20   issue of disability from one's own specific occupation, as opposed to what is typical in a large class

21   of occupations.  Instead, it addressed the quite different question of whether the social security grids

22   applied to find the plaintiff there able to work in any occupation, and held that they failed to

23   completely describe the plaintiff's limitations.

24        Defendant also claims that even though Plaintiff's employer's job demand form indicates

25   that Plaintiff's job requires sitting for seven hours "constantly" (AR at 650), the form did not mean

26   sitting without interruption, but instead meant that the job requires sitting 67-100% of the time.

27   Therefore, according to Defendant, Plaintiff's job is not incompatible with a sedentary skilled

28   position in which a person could sit or stand at will.  See Def.'s Supp. Brief re: Remand at 2, n. 1.

**United States District Court**
For the Northern District of California

1    There is no evidence, however, to support Defendant's construction of the term "constantly" as

2    applied to the sitting requirement, or to indicate that the term "constantly" has any other meaning

3    that its dictionary definition.  See Oxford English Dictionary on-line, (2d ed. 1989) ("In a constant

4    manner. . . . Invariably, uniformly, regularly, in every case, always.  Continually, perpetually,

5    incessantly, always."),

6    http://dictionary.oed.com/cgi/entry/50048093?query_type=word&queryword=constantly

7    &first=1&max_to_show=10&single=1&sort_type=alpha.  Although the form defines "constantly"

8    as 67-100% of the time in separate subparts II and III of the form, that definition is absent from the

9    relevant subpart I regarding sitting.  AR at 650.  Further, Defendant's definition of "constantly" as a

10    percentage of time seems inconsistent with the fact that the form also offers "with rest" as an

11    alternative box to check instead of "constantly" for the sitting requirement, and Defendant indeed

12    checked "with rest" when referring to the standing requirement of Plaintiff's job.  AR at 650.

13        Moreover, the record contains evidence that Plaintiff was experiencing pain, coupled with

14    difficulties in tolerating pain medication, which could affect her ability to work in her occupation.

15    Dr. Collins stated in her August 28, 2004 letter that Plaintiff "has had [a] difficult time with pain

16    medication, as she has a reaction to almost everything she has been prescribed."  Frei Decl. Ex. B.

17    In his report, Dr. Schlachter noted Plaintiff's own reports of pain in her June 2003 interview:

18          An interview on 6/25/03 revealed that claimant takes oxycodone 325mg every 6
          hours.  She states that she can walk for about an hour at which time the pain gets
19          bad in her legs.  That she can sit for about one hour in a soft reclining chair when
          she develops pain in the tailbone and legs.  Pain extends to the chest, feels like
20          getting hit with a baseball bat, skin feels taut, groin goes numb, legs get cold and
          throb.  Standing is tolerated for about 30 minutes.

21

22    AR at 73.  Dr. Ellenbogen reports that Plaintiff has chronic pain symptoms for which he

23    recommended medication.  AR at 16-17.  A March 2003 report from the Pain Management Center

24    indicates that Plaintiff has chronic pain that was not relieved by multiple medications.  AR at 214.

25    Dr. Barbaro, Plaintiff's former neurosurgeon, reported in April 2003 that Plaintiff had a variety of

26    pain complaints that were not controlled by medication.  AR at 175.  While by itself the issue of pain

27    would not be a reason to deny summary judgment, and the surveillance video provides some

28

evidence that her reports of pain may be exaggerated,[5] Defendant's failure to explicitly consider this evidence of pain and side effects from medication in its decision may well have aggravated its error in not applying its policy's actual definition of disability.

Accordingly, Defendant's motion for summary judgment is denied.  The Court remands this matter to the plan administrator for a determination of Plaintiff's claim consistent with this Order.  See Saffle, 85 F.3d at 461 (stating that "remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination").  On remand, Defendant should determine whether Plaintiff can perform the essential duties of her occupation as a sales assistant/Assistant Vice-President at a trading desk in the investment banking sector in view of her limitations, without simply assuming accommodations that may not be available.

**IT IS SO ORDERED.**

Dated: March 7, 2006

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge

United States District Court
For the Northern District of California

---

[5]     The video shows Plaintiff, *inter alia*, running errands, pumping gas into her car, walking briskly down the street, standing while talking to another person and carrying multiple bags.  However, the reports of the surveillance company reveal that, although Plaintiff left her house to run errands on certain days, she either did not leave her apartment or only left for shorter periods on the days following her excursions.  AR at 249-252 (surveillance on June 14-15, 2002); 255-56 (surveillance on November 19-20, 2002); 259-62 (surveillance on January 4-5, 2003).  Plaintiff's activities on the surveillance video are generally consistent with Dr. Collins' statement that "Ms. Frei's day may consist of doing a few errands around the house or around town, and then she will spend from 6-8 hours up in her guest room lying on a heating pad, depending on the pain."  Frei Decl. Ex. B.  The video, however, does not shed much light on whether Plaintiff can perform the essential duties of her job, that is, sitting for seven hours and standing for one hour with rest.